** E-filed on 3/17/05 **

NOT FOR CITATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

ADVANTACARE HEALTH PARTNERS, LP
AND HEALTHCARE PATHWAYS
MANAGEMENT, INC.,

Plaintiffs,

v.

ACCESS IV, GARY DANGERFIELD, AND
GWEN PORTER,

Defendants.

Case Number C 03-04496 JF

**ORDER RE PLAINTIFFS'
MOTION FOR FURTHER
SANCTIONS**

[Doc. No. 101]

Plaintiffs seek terminating and monetary sanctions for Defendants' alleged continuing violations of this Court's orders. The Court has considered the moving and responding papers and the oral arguments presented at the hearing on February 25, 2005. For the reasons discussed below, the Court concludes that terminating sanctions are appropriate. Because of the severity of the remedy imposed and because in any event Plaintiffs will be entitled to costs as the prevailing party in the underlying litigation, the Court will decline to order additional monetary sanctions.

## I.  BACKGROUND

Plaintiffs AdvantaCare Health Partners, LP and Healthcare Pathways Management, Inc. (collectively, "AdvantaCare") provide in-home intravenous services in Monterey, Santa Cruz, San Benito and Santa Clara Counties. AdvantaCare obtains customers through referrals from

1  hospital discharge planners, home health agencies and doctors.

2      Two of AdvantaCare's key employees, Gwen Porter ("Porter") and Gary Dangerfield

3  ("Dangerfield"), resigned in August 2003, but continued working at AdvantaCare until

4  September 4 and 5, respectively.  Porter had been with AdvantaCare since 1995 and at the time

5  of her resignation was the company's "Community Liaison," responsible for marketing

6  AdvantaCare to referral sources, developing relationships with those sources, and maintaining

7  records of referral contacts.  Dangerfield had been with AdvantaCare since 1997 and at the time

8  of his resignation was the company's "Director of Operations," responsible for overall

9  management of AdvantaCare, including the pharmacy, nursing, reimbursement, materials and

10 sales departments.

11     After leaving Advantacare, Porter and Dangerfield immediately began a new business,

12 Access IV, Inc. ("Access IV"), which competes directly with AdvantaCare.  AdvantaCare first

13 learned of the existence of Access IV on September 10, 2003.  AdvantaCare subsequently

14 discovered that Porter and Dangerfield had incorporated Access IV in November 2002, had

15 leased office space in January 2003, and otherwise had begun preparations for competing with

16 AdvantaCare while still employed by AdvantaCare.  AdvantaCare then retained a computer

17 forensic expert, who determined that Dangerfield had accessed AdvantaCare's computer network

18 and had copied a large number of AdvantaCare's files, including files containing company

19 policies and procedures, patient databases, employee lists and contracts.  The forensic expert also

20 determined that Dangerfield tried to conceal his copying activities by deleting copied files from

21 his hard drive.  For present purposes, these facts are undisputed.

22     On September 11, 2003, AdvantaCare demanded in writing that Dangerfield and Porter

23 refrain from using AdvantaCare's proprietary and confidential business information and return

24 all AdvantaCare information and documents in their possession.  On September 17, 2003,

25 counsel for Defendants responded, claiming that Defendants did not have any property that

26 belonged to AdvantaCare.  Despite this express denial, Dangerfield later admitted at his

27 deposition that Defendants had thousands of AdvantaCare files on their computers and that he

28 personally had deleted AdvantaCare files from his office computer shortly after receiving the

2

"cease and desist" letter from AdvantaCare.

On October 6, 2003, AdvantaCare filed an application for a temporary restraining order ("TRO"), which this Court granted.  The TRO prohibited Defendants from "copying, using or destroying any (a) paper, compact disk or other data storage medium containing AdvantaCare data; (b) AdvantaCare account records and/or notes; (c) AdvantaCare's policies and procedures; (d) AdvantaCare provider agreements; (e) AdvantaCare financial information; and (f) AdvantaCare personnel information."  The TRO directed Defendants to produce "any and all compact disks containing information obtained from AdvantaCare's computers, computer systems and/or computer network."  Finally, the TRO and accompanying notice of expedited discovery required Defendants to permit AdvantaCare to make forensic copies of "the hard drive and/or network server for any computer used by Defendant Access IV at any time" as well as "the hard drive and/or network server for any personal computer used by Defendant Gary Dangerfield on or after January 1, 2002."

Dangerfield and Access IV were served with the TRO and notice of expedited discovery at 4:20 pm on October 6, 2003.  Within hours after being served, Defendants, and specifically Dangerfield, destroyed evidence relevant to the action.  Dangerfield visited numerous websites in search of computer data deletion software.  At 9:00 pm, Dangerfield downloaded a filed deletion program called BC Wipe, one of the strongest such programs available.  Between October 7 and October 10, 2003, Dangerfield deleted more than thirteen thousand files from his home computer using BC Wipe.  He also deleted files from the office computer and server.  Dangerfield deleted more than one hundred additional files from his home computer just hours before presenting the hard drive to AdvantaCare for copying pursuant to the TRO.

Beginning on October 9, 2003, Mark Alcock ("Alcock"), AdvantaCare's computer forensic expert, copied five of Defendants' hard drives.  Alcock found thousands of AdvantaCare files stored on Dangerfield's home and office computers and on the hard drive that functioned as Access IV's server.  He also discovered that Defendants had continued to access and delete AdvantaCare files located on Dangerfield's home and office computers and on the server after the cease and desist letter was sent and after service of the TRO.  Alcock could not recover files

Case No. C 03-4496 JF
ORDER RE PLAINTIFFS' MOTION FOR FURTHER SANCTIONS
(JFEX1)

1    deleted with BC Wipe.

2         On October 23, 2003, the Court granted in part and denied in part Plaintiffs' request for a

3    preliminary injunction.  Defendants were ordered to return all material owned by Plaintiffs

4    immediately.  Defendants also were enjoined from soliciting any referral sources for a period of

5    forty-five days after the issuance of the TRO, or until November 20, 2003.

6         On or about November 3, 2003, Defendants sent a letter to physicians in Monterey

7    County denying they had been involved in any compromise of AdvantaCare patient information.

8    At his deposition, however, Dangerfield testified otherwise.  AdvantaCare concluded that it had a

9    statutory obligation to inform its patients that their information had been copied without

10   authorization and sent a notice to that effect on November 5, 2003.

11        The parties agreed that Defendants would comply with the preliminary injunction by

12   using BC Wipe to delete all of AdvantaCare's information and data and that AdvantaCare would

13   re-image Defendants' hard drives to verify compliance.  However, on November 20, 2003, when

14   he re-imaged Defendants' hard drives, Alcock found that thousands of AdvantaCare files still

15   remained on the drives.  The remaining files included confidential, proprietary information such

16   as AdvantaCare's patient database, 2003 budget, employees' wages, referral statistics, forms, and

17   marketing materials.  Alcock also found numerous "Access IV" documents identical or nearly

18   identical to AdvantaCare documents formerly stored on Defendants' hard drives.  Defendants

19   sought to excuse their non-compliance by claiming that because AdvantaCare had not identified

20   each of its files by name, directory, and computer, Dangerfield could not ensure that he had

21   deleted all of AdvantaCare's files.  Defendants also claimed that because he knew that the hard

22   drives would be subject to reexamination by Alcock, Dangerfield would not have left any

23   AdvantaCare files on the Access IV computers intentionally.

24        On December 24, 2003, Plaintiffs filed a motion for recovery of discovery costs, to

25   compel production of documents and for discovery sanctions in the form of attorney's fees, based

26   upon Defendants' conduct prior to that date.  On January 28, 2004, Chief Magistrate Judge

27   Trumbull denied relief without prejudice to a formal motion for sanctions before this Court.

28   Plaintiffs filed a motion for sanctions on April 13, 2004, based upon Defendant's destruction of

4

1    evidence and violation of court orders as described above.  The motion was argued and submitted

2    on June 24, 2004.

3          On August 4, 2004, while a decision on the motion was still pending, Plaintiffs

4    commenced a meet and confer process based upon a suggestion made by the Court during the

5    June 24 motion hearing.  On August 10, 2004, Defendants informed Plaintiffs that at some time

6    prior to that date, and without notification to Plaintiffs, Defendants had returned to a leasing

7    company two of the hard drives previously used by Access IV in its business.  The hard drives

8    were wiped clean by the leasing company.

9          On August 17, 2004, the Court issued a written order granting in part and denying in part

10   Plaintiffs' motion for sanctions.  The Court found specifically that Defendants engaged in

11   affirmative misconduct when Dangerfield intentionally destroyed files[1] in response to the cease

12   and desist letter and searched for and used deletion software to delete thousands of computer files

13   after being served with the TRO.  It also found that Defendants further engaged in sanctionable

14   conduct by failing to delete AdvantaCare files as required by the preliminary injunction.

15   Although it determined that Defendants' destruction of evidence exhibited willfulness, fault and

16   bad faith, the Court declined to order terminating sanctions at that time.  Instead, it: (1) ordered

17   an evidentiary sanction in the form of a presumption that Dangerfield copied every AdvantaCare

18   file on the AdvantaCare system; (2) ordered counsel to meet and confer to identify any

19   AdvantaCare files remaining to be deleted; (3) placed the burden on Defendants to demonstrate

20   compliance with the preliminary injunction affirmatively and ordered Defendants to allow

21   Plaintiffs to re-examine Defendants' hard drives to ensure such compliance; (4) expressly warned

22   Defendants that any further failure on their part to comply with court orders would result in entry

23   of default judgment against them; and (5) awarded monetary sanctions to Plaintiffs in the amount

24   of $20,000.

25         The meet and confer process, which as noted above actually had begun while the motion

26   for sanctions was pending, continued for several weeks.  The parties then stipulated to a means

27

28         [1]  The Court did not consider the two hard drives that Access IV returned to the leasing
     company.

Case No. C 03-4496 JF
ORDER RE PLAINTIFFS' MOTION FOR FURTHER SANCTIONS
(JFEX1)

by which Defendants would seek to demonstrate compliance with the preliminary injunction while at the same time ensuring that potentially discoverable evidence would not be deleted from Access IV hard drives. On September 30, 2004, the Court issued an order approving the parties' stipulation. The stipulation and order provided that: (1) Access IV would copy all files on its computers to eleven compact disks; (2) Access IV would remove the hard drives from its six existing computers and send them to its counsel, Gregory J. Charles, Esq. ("Charles"), to hold throughout the proceedings; (3) Charles would retain a seventh hard drive previously removed from Dangerfield's home computer; (4) Access IV would replace the six hard drives that had been removed with new hard drives; (5) Access IV would load the data from the eleven compact disks onto a new file server; (6) Access IV's computers and hard drives and the eleven compact disks would be made available for inspection by Plaintiffs forensic expert; (7) Charles would maintain in a secure room the original seven hard drives, and neither the hard drives nor their contents would be released absent a stipulation between the parties or by court order; and (8) at the conclusion of the case, the seven hard drives would be destroyed.

It is undisputed that Defendants undertook certain actions pursuant to the stipulation and order. On August 20, 2004, Defendants began to search for files that belonged to AdvantaCare by: (1) having each of its employees use Windows Explorer to search for files and the contents of files containing the words "AdvantaCare," or any derivation thereof, and "CCIV"; (2) performing an advanced search to look for files, hidden files, system files and key words in the files themselves; (3) evaluating each such file detected by the search to see if the file was an AdvantaCare file (if so, deleting the files using BC Wipe); (4) rechecking each computer for any AdvantaCare files; (5) examining the "Author" field of each document (and deleting the file if the author was an AdvantaCare employee); and (6) examining the "Company" field of each document (and deleting the file if that field listed "AdvantaCare" or "CCIV").

After completion of the file search, review, and deletion process, Access IV employees were instructed to identify the files on each workstation that were needed by the employee to perform the employee's job. After the designated files on each workstation were copied and burned onto compact disks, the hard drive was removed and labeled with the name of the

6

1   employee who used the specified workstation.  Access IV then replaced its original servers and

2   workstation hard drives with new servers and new workstation hard drives.  The original hard

3   drives were turned over to Charles.  The network consultant hired by Access IV then established

4   connections between the workstations and the new server.[2]

5       Access IV then installed HITS, a commercially available patient management program

6   used by home infusion therapy companies, on the new servers.  It hired Ron Gill ("Gill"), a

7   consultant and author of the HITS program, to install the program.  Dangerfield explained the

8   terms of the parties' stipulation to Gill prior to the installation.  Gill carried out the installation in

9   three steps: (1) the HITS software program was installed onto the new server; (2) the HITS

10  database files from the old server were copied onto compact disks and then copied from compact

11  disks onto the new server;[3] and (3) the individual workstations were configured.

12      During the first week of September 2004, Plaintiffs were advised that Defendants had

13  completed the stipulated process.[4]  On September 23, 2004, Alcock traveled to Monterey to re-

14  image the new hard drives. Alcock completed this process on September 24, 2004.  On

15  September 27, 2004, Defendants provided Alcock with copies of the compact disks that

16  purportedly contained all of the files that had been loaded onto the new hard drives.  Alcock then

17  began his examination of the hard drives and the compact disks.

18      Despite these actions by Defendants, Plaintiffs expressed ongoing concerns during

19  November and December 2004 that Defendants were not complying fully with the Court's

20  orders.  On December 23, 2004, after Alcock had completed his work, Plaintiffs filed the instant

21

22      [2]  Defendants do not specify whether the files uploaded to the new server were the files

23  that remained after the search, review, and deletion process, or whether the files uploaded were
    the files designated by the employees as necessary and burned to the compact disks.  Pursuant to

24  the parties' agreement, the files to be uploaded were to be the files contained on the compact

25  disks.

26      [3]  It is unclear whether the Access IV employees also reviewed the HITS database to

27  search for files that belonged to AdvantaCare prior to Gill copying the HITS database files from
    the old server onto the new server.

28      [4]  The date and form of the communication is not indicated by either party.

7

1  motion for further sanctions, alleging that: (1) although the compact disks provided to Alcock by

2  Access IV contained password protected files, no passwords were provided by Access IV; (2)

3  Access IV still was in possession of numerous AdvantaCare files; (3) Access IV's new hard

4  drives contained evidence that Access IV had previously undisclosed data sources that were not

5  produced to AdvantaCare for inspection; (4) there was evidence that thousands of files had been

6  loaded on, modified and deleted from the new hard drives; (5) compact disks had been burned

7  from Dangerfield's hard drive that were not provided to AdvantaCare; and (6) there was a

8  discrepancy between the data contained on the compact disks and the data contained on the hard

9  drives.  In their opposition to the motion, Defendants deny these allegations, claiming that any

10  AdvantaCare files still in their possession were inadvertently uploaded by Gill, are not in use or

11  useable or are not proprietary to AdvantaCare.

## II.  DISCUSSION

### A.    The Court May Sanction Defendants for Willful Disobedience of a Court Order

15         District courts may impose sanctions as part of their inherent power "for willful

16  disobedience of a court order."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (quoting

17  *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 420, 258 (1975)).  The Court may

18  sanction a disobedient party in three ways that are relevant here.  First, it may enter a default

19  judgment against the party.  *Chambers*, 501 U.S. at 45 ("[O]utright dismissal . . . is a particularly

20  severe sanction, yet is within the court's discretion.").  Second, it may issue civil contempt

21  sanctions, which are intended either to coerce the party into compliance with the Court's order,

22  compensate the plaintiff for the violation, or both.  *Whittaker Corp. v. Execuair Corp.*, 953 F.2d

23  510, 516 (9th Cir. 1992).  Finally, the Court may assess attorney's fees.  *Chambers*, 501 U.S. at

24  45 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980).

25         Because of their potency, theses inherent powers must be exercised with restraint and

26  discretion.  *Roadway Express*, 447 U.S. at 764.  A primary aspect of that restraint and discretion

27  is fashioning a sanction appropriate to the conduct in question.  *Id.* at 765.  When choosing

28  among possible sanctions, the Court should consider a sanction designed to: (1) penalize those

8

1   whose conduct may be deemed to warrant such a sanction; (2) deter parties from engaging in the

2   sanctioned conduct; (3) place the risk of an erroneous judgment on the party who wrongfully

3   created the risk; and (4) restore a prejudiced party to the same position he or she would have been

4   in absent wrongful destruction of evidence by the opposing party. *See Nat'l Hockey League v.*

5   *Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d

6   585, 589 (9th Cir. 1983); *West v. Goodyear Tire and Rubber Co.*, 167 F.3d 776, 779 (2d Cir.

7   1999). In evaluating the propriety of sanctions, the Court may consider all incidents of prior

8   misconduct, including prior misconduct that already has been subject to sanction. *Henry v. Gill*

9   *Indus., Inc.*, 983 F.2d 943, 947 (9th Cir. 1993).

10          **B.    Default Judgment**

11          Plaintiffs move for a default judgment against Defendants, asserting that Defendants

12  repeatedly have failed to comply with the Court's orders and that no other remedy would

13  effectively vindicate their legal rights. Plaintiffs claim that despite the substantial monetary

14  sanction and express warning in the Court's order of August 17, 2004, Defendants: (1) have

15  continued to destroy evidence; (2) have failed to abide by the stipulated process by which Access

16  IV's computers would be cleared of files belonging to AdvantaCare; and (3) have not returned

17  any hard copies of AdvantaCare documents. Defendants claim that they have made extensive

18  efforts to comply with the Court's orders.

19          Default judgment is a particularly severe sanction, *Roadway Express* at 764, and it should

20  be entered against a party only if lesser sanctions have proved to be ineffective, *Halaco Eng'g*

21  *Co. v. Costle*, 843 F.2d 367, 379-81 (9th Cir. 1988). A default judgment most often is

22  appropriate where a "pattern of deception and discovery abuse made it impossible" for the

23  district court to conduct a trial "with any reasonable assurance that the truth would be available."

24  *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 352 (9th Cir. 1995).

25  Moreover, default judgment is appropriate where the offending conduct is the result of

26  willfulness, fault or bad faith. *Halaco* 843 F.2d at 380.

27          The Court should consider five factors before imposing default judgment as a sanction for

28  failure to comply with a court order: (1) the public's interest in expeditious resolution of

9

1   litigation; (2) the Court's need to manage its dockets; (3) the risk of prejudice to [the party

2   seeking sanctions]; (4) the public policy favoring disposition of the cases on their merits; and (5)

3   the availability of less drastic sanctions. *Malone v. United States Postal Serv.*, 833 F.2d 128, 130

4   (9th Cir. 1987). "Where a court order is violated, the first two factors support sanctions and the

5   fourth factor cuts against a default. Therefore, it is the third and fifth factors that are decisive."

6   *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990).

7        **C.   Willfulness, Fault and Bad Faith**

8        The Court previously has held that Defendants were guilty of willfulness, fault and bad

9   faith in failing to comply with the TRO and the preliminary injunction. "Disobedient conduct

10  not shown to be outside the control of the litigant is sufficient to demonstrate willfulness, fault,

11  and bad faith." *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003). Despite the fact that

12  they stipulated to and apparently took at least some action to implement a process to verify their

13  belated efforts to comply with the preliminary injunction, the Court finds that Defendants

14  nonetheless have continued to engage in affirmative misconduct by continuing to destroy

15  evidence. Even while Plaintiffs' previous motion for sanctions was under submission,

16  Defendants returned two hard drives to the leasing company that were wiped clean. The

17  evidence shows that after the Court issued its order of August 17, 2004, numerous files were

18  deleted from Access IV's new servers, and Dangerfield both superficially deleted and used BC

19  Wipe to delete files from his new hard drive.[5] There also is evidence of numerous compact disk

20  burning sessions on Dangerfield's new hard drive.[6] The Court already has imposed an

21

22        [5] Plaintiffs claim that more than 9,000 files were deleted from Defendants' new servers
    and Dangerfield's new hard drive. Although there may be a legitimate reason for the deletion of
23  some files, the sheer number of files deleted from both the new servers and Dangerfield's new
    hard drive, in addition to the presence of one superficially deleted AdvantaCare file on
24  Dangerfield's new hard drive, suggest an equally plausible illegitimate reason for the deletion of
    the files. Given his past misconduct and untruthfulness in this case, the Court gives little
25  credence to Dangerfield's explanation.

26

27        [6] Plaintiffs claim that Dangerfield is continuing the practice of burning compact disks
    with AdvantaCare files, modifying the documents for Access IV use, and then deleting the
28  AdvantaCare version of the files from the hard drives. Defendants claim that there are valid
    business purposes for burning compact disks. Defendants offer no valid business purpose for

10

1   evidentiary sanction instructing the trier of fact to infer that Defendants copied *all* of

2   AdvantaCare's files.  No further evidentiary sanction can be imposed that would address the

3   destruction of evidence contained on the two hard drives returned to the leasing company or

4   deleted from the new servers and Dangerfield's new hard drive.

5        Plaintiffs also present persuasive evidence that Defendants have failed to abide by the

6   stipulated process by which Access IV's computers would be cleared of files belonging to

7   AdvantaCare.  They show that a number of AdvantaCare files were introduced to Defendants'

8   computers after September 1, 2004, from alternative data sources[7] other than the compact disks[8]

9   provided to AdvantaCare.  Defendants offer the explanation that any additional files introduced

10  to the system were not from alternative data sources, and that those files inadvertently were

11  transferred[9] by Gill, Defendants' HITS database consultant, were unknown to Defendants,[10] or

12

13  _____

14  such activity, particularly in light of their prior conduct.

15      [7] Plaintiffs identified the alternative data sources as "CCIV," "Jane Abraham" (a former
16  AdvantaCare employee) and "AdvantaCare Infusion."

17      [8] On February 16, 2004, Defendants filed an *ex parte* application to file a surreply
18  memorandum in opposition to Plaintiffs' further motion for sanctions.  Although the Court finds
    that this application was procedurally defective, the Court has considered Defendants' claim that
19  each file indicated by Plaintiffs as belonging to AdvantaCare is located on the compact disks.
    The Court notes that even if the files were present on both the compact disks and the hard drives,
20  the *original* source of those files still is in question.

21      [9] Defendants claim that their search method would not have produced the AdvantaCare
22  patient database file.  Plaintiffs argue that Defendants necessarily were aware of the existence
    and location of the file because Plaintiffs identified the file in their initial motion for sanctions
23  and that Defendants should have deleted the file pursuant to the Court's orders.  Moreover,
    Plaintiffs point out that in addition to the old patient database file, a new version of the
24  AdvantaCare patient database file was introduced to the server hard drives on September 1, 2004,
    accessed on September 7, 2004 and modified on September 9, 2004.  Under these circumstances,
25  Plaintiffs argue convincingly that Defendants' failure to detect and delete the old patient database
26  file and the introduction of a new version of the patient database file could not have been
    inadvertent.

27
        [10] Defendants claim that their search method would not have produced the "PICC
28  Troubleshooting Guide" because the document does not contain any reference to AdvantaCare.

11

1    are not proprietary to Plaintiffs.[11]

2         However, despite their attempts to explain their most recent conduct, Defendants do not

3    deny possessing AdvantaCare files long after such possession could be explained legitimately.

4    Defendants have known for months that in light of their past behavior, any possession of

5    AdvantaCare files would be deemed a material violation of the Court's orders.  Nor is there any

6    indication that Access IV has returned any of the hard copies of AdvantaCare documents that

7    may be in its possession.  Particularly in view of the fact that they were warned specifically that

8    any further misconduct would result in terminating sanctions, Defendants' conduct is

9    inexcusable.

10        **D.    Prejudice**

11        Under the third factor set forth in *Malone*, a plaintiff suffers prejudice if the defendant's

12   actions "impair [the plaintiff's] ability to go to trial or threaten to interfere with the rightful

13   decision of the case."  *Malone* at 131.  Plaintiffs claim that they continue to suffer prejudice

14   because Defendants: (1) continue to possess and use AdvantaCare files contrary to court orders;

15   (2) have additional AdvantaCare data and files from sources not previously disclosed to

16   Plaintiffs; and (3) have been operating in direct competition with Plaintiffs, causing harm to

17   AdvantaCare's market share and reputation.  Defendants once again claim that Plaintiffs could

18   have made certain that all AdvantaCare files were deleted by providing Access IV with a list

19   identifying those files.  However, it would be unreasonable to shift the burden of identifying each

20   misappropriated file to Plaintiffs.  Defendants have been operating in direct competition with

21   AdvantaCare for more than one year with the benefit of valuable AdvantaCare data and files,

22   such as the patient database, PICC Troubleshooting Guide and Pump Testing Document.

23   Defendants' continuing conduct frustrates the principal purpose for which Plaintiff brought the

24

25        [11]  Defendants claim that the "PICC Troubleshooting Guide" and the "Pump Testing
26   Document" are not proprietary to Plaintiffs.  The proprietary nature of the documents is
     irrelevant.  The Court already has indicated that "the presence of files bearing Access IV's mark
27   but clearly based upon AdvantaCare's model documents suggests intentional rather than knowing
     circumventions of the injunction."  The continued presence of such documents on Access IV's
28   hard drives is quite troubling.

Case No. C 03-4496 JF
ORDER RE PLAINTIFFS' MOTION FOR FURTHER SANCTIONS
(JFEX1)

1 | instant lawsuit, which is to prevent unlawful use of its proprietary information.

2 | **E.    The Effectiveness of Less Drastic Sanctions**

3 | Pursuant to the fifth factor set forth in *Malone*, default judgment may not be imposed

4 | "without first considering the impact of the sanction and the adequacy of less drastic sanctions."

5 | *Adriana* at 1412.  A three-prong analysis is used to determine whether the adequacy of less

6 | drastic sanctions have been properly considered: "(1) did the court explicitly discuss the

7 | feasibility of less drastic sanctions and explain why alternative sanctions would be inappropriate,

8 | (2) did the court implement alternative sanctions before dismissing the order, and (3) did the

9 | court warn the party of the possibility of a dismissal before actually ordering a dismissal?" *Id*. at

10 | 1412-13.  "However, in egregious cases where the court actually imposes alternative sanctions

11 | before default, such an inquiry [as to the first and second prongs of the analysis] is not

12 | necessary." *Id*. at 1413.

13 | In this case, the Court previously has imposed evidentiary and monetary sanctions.  It

14 | expressly warned Defendants of the possibility of a default judgment in the event of further

15 | misconduct.  Although Defendants apparently have made some effect to comply with the

16 | preliminary injunction, the sincerity of their intentions is highly suspect in light of the continued

17 | presence of AdvantaCare files on Access IV hard drives and their continued destruction of

18 | evidence.  Defendants knew that they would bear the affirmative burden of demonstrating their

19 | full compliance with the Court's order of August 17, 2004.  Unfortunately, Defendants' conduct

20 | from the inception of this case exhibits a pattern of deception and discovery abuse for which less

21 | drastic sanctions have proved to be ineffective.  Accordingly, the Court concludes that default

22 | judgment is an appropriate sanction.

23 | **F.    Monetary Sanctions**

24 | Plaintiffs also seek monetary sanctions, including specific sums for fees and costs

25 | incurred in evaluating Defendants' compliance with the Court's orders and in bringing the instant

26 | motion for further sanctions.  Defendants claim that monetary sanctions are inappropriate

27 | because they have not acted willfully or in bad faith and Plaintiffs have failed to assist the

28 | Defendants by providing a list of files that Access IV should delete.  Defendants also claim that

13

1  the amounts requested by Plaintiffs for attorneys fees, expert fees and administrative costs are

2  exorbitant.

3      The "American Rule" prohibits fee-shifting in most cases. *Chambers*, 501 U.S. at 45.

4  However, fee-shifting is permitted in response to a party's willful disobedience of a court order.

5  *Id*. at 45.  A court's discretion to determine the degree of punishment for contempt allows the

6  court to impose attorney's fees representing the entire cost of the litigation. *Id.*  It also is

7  permitted when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."

8  *Id*. at 45-46.  In imposing a fee sanction, the court can vindicate judicial authority and make the

9  prevailing party whole.  *Id.*

10     As discussed above, the Court finds that Defendants have acted wilfully and in bad faith,

11  and accordingly has concluded that terminating sanctions are appropriate.  Because of the

12  severity of that sanction, and in the exercise of its discretion, the Court declines to award

13  additional monetary sanctions.

14                          **III. ORDER**

15     Good cause therefore appearing, IT IS HEREBY ORDERED that:

16  1.    Defendants' answer shall be stricken, and default judgment shall be entered in favor of

17        Plaintiffs; and

18  2.    Plaintiffs' request for additional monetary sanctions is denied.

19

20  DATED: March 16, 2005

21                                          /s/ (electronic signature authorized)
                                            JEREMY FOGEL
22                                          United States District Judge

23

24

25

26

27

28

                              14

1  This Order has been served upon the following persons:

2  Gail Melissa Blanchard-Saiger, Gblanchard-Saiger@foleylaw.com

3  Gregory J. Charles, gjc@svlg.com; mwo@svlg.com; keb@svlg.com

4  Nancy J. Geenan, ngeenan@foleylaw.com; rbarceba@foleylaw.com

5  Kalpana V. Peddibhotla, kvp@svlg.com

6  Kathryn E. Barrett
   Silicon Valley Law Group
7  25 Metro Drive, 6th Floor
   San Jose, CA  95110
8
   James T. Jones
9  Foley & Lardner, Attorneys at Law
   300 Capitol Mall
10 Suite 1125
   Sacramento, CA   95814-4339

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15